COMMONWEALTH SCIENTIFIC
AND INDUSTRIAL RESEARCH
ORGANISATION, Plaintiff

v.

BUFFALO TECHNOLOGY INC., and
Buffalo, Inc., Defendants.

No. 6:06–CV–324.

United States District Court,
E.D. Texas,
Tyler Division.

June 15, 2007.

Sidney C. Capshaw, III, Andrew W. Spangler and Elizabeth L. DeRieux of

Brown McCarroll, Longview, TX, D. Stuart Bartow, Daniel J. Furniss, Gary H. Ritchey, and Robert D. Tadlock of Townsend & Townsend & Crew, Palo Alto, CA, Deborah J. Race and Otis W. Carroll, Jr. of Ireland Carroll & Kelly, Tyler, TX, Franklin Jones, Jr. of Jones & Jones, Marshall, TX, for Plaintiff.

Richard J. Codding, Joanna H. Kim, and Justin A. Radell of Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, Allen F. Gardner and Michael E. Jones of Potter, Minton PC, Tyler, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Before the Court is Plaintiff Commonwealth Scientific and Industrial Research Organisation's ("CSIRO") Motion for Entry of Permanent Injunction (Docket No. 234). Having considered the relevant briefing, oral arguments, and the applicable law, the Court **GRANTS** CSIRO's Motion for Entry of Permanent Injunction.

## BACKGROUND

CSIRO is the principal scientific research organization of the Australian Federal Government. Established in 1926, CSIRO conducts scientific research and applies the efforts of that research to benefit the public at large. CSIRO is similar to the United States' National Science Foundation and National Institute of Health. CSIRO has a broad charter to advance health, prosperity, and welfare by conducting strategic scientific research and applying the results of that research to benefit Australia and people everywhere. CSIRO operates its own laboratories and is active in the areas of health, agriculture, energy, information technology, minerals, manufacturing, marine and terrestrial environments, and natural resources. One of CSIRO's broad goals is to develop technology that can be used to create start-up companies and/or be licensed to firms to earn commercial royalties to fund other research.

In the very late 1980's and early 1990's groups throughout the world were trying to design an indoor wireless network. However, the indoor radio environment presented problems with signal interference because radio waves can be reflected by some materials such as walls, furniture, and other indoor items causing them to arrive at the receiver from different paths and at different times. This is known as the "multipath" problem. Studies revealed that minor changes in a room resulted in major changes in the propagation characteristics. Companies all over the world made efforts to solve the multipath problem.

In February 1992, CSIRO engineers identified the key elements to the solution of the multipath problem. Avoiding the multipath problem requires a lengthening of signal duration, which negatively impacts data rate. To overcome the loss of data rate, the use of orthogonal frequency division multiplexing, which permits data to be sent on multiple channels simultaneously, was incorporated. The data is broken into subparts and each subpart is simultaneously transmitted on a different carrier frequency. Because there is simultaneous transmission of all the signal parts, the data transmission rate is higher than with other approaches. Techniques such as error correction and interleaving were used to deliver high reliability in the data transmission.

On November 22, 1992, CSIRO filed a patent application with the Australian Patent Office. On November 23, 1993, CSIRO filed an application for a United States patent based on the same disclosure. U.S.

Patent No. 5,487,069 ("the '069 patent") issued on January 23, 1996. CSIRO has also obtained patents in Japan and Europe for its Wireless Local Area Network ("WLAN") invention.

CSIRO's intent from the beginning was to derive revenue from its invention through licensing the '069 patent. In 1997, CSIRO and Macquarie University formed Radiata Communications Pty Ltd., an Australian company, to commercialize the '069 patent. CSIRO licensed the '069 patent to Radiata, and in 2001 Cisco Systems, Inc. acquired Radiata for $295 million in stock and began paying royalties to CSIRO.

In 1998, the Institute of Electrical and Electronics Engineers ("IEEE") contacted CSIRO to request assurance that CSIRO would license its '069 patent to companies wanting to implement the IEEE's 802.11a standard on reasonable and non-discriminatory ("RAND") terms once the IEEE approved the 802.11 standard, which pertains to WLANs. CSIRO agreed. In 1999, the IEEE ratified the 802.11a standard, which embodies the core technology invention by CSIRO. The IEEE also ratified the 802.11b standard, which differs from CSIRO's invention, and was initially adopted by more companies. In 2003, the IEEE ratified the 802.11g standard, which also embodies CSIRO's invention. In 2003, CSIRO contacted companies who practiced the '069 patent and began license agreement discussions. None of the potential licensees accepted CSIRO's license agreement offer.

On February 2, 2005, CSIRO brought suit against Buffalo Technology, Inc., an American corporation, and Buffalo, Inc., a Japanese corporation, (collectively "Buffalo") alleging infringement of the '069 patent. Buffalo competes in the production and sale of WLAN products that are compliant with the IEEE 802.11a and 802.11g

standards. The sale of WLAN products comprise approximately eleven percent of Buffalo Technology's business. In addition to its wireless products, Buffalo sells memory products and network accessories. Buffalo's family of products is sold to distributors and retail outlet stores. Since Buffalo utilizes the IEEE 802.11a and g standards, this suit would serve as a test case to determine whether WLANs compliant with IEEE 802.11a and g standards infringe the '069 patent and to determine the validity of the '069 patent in light of the prior art.

The Court held a *Markman* hearing on February 22, 2006 and issued an opinion construing the claims of the '069 patent on May 8, 2006. At the pretrial hearing on July 20, 2006, CSIRO and Buffalo agreed to submit the case on cross motions for summary judgment on infringement, invalidity over prior art, and invalidity for lack of sufficient written description in lieu of a jury trial. After hearing oral arguments on August 15 and considering all of the summary judgment evidence that was submitted, the Court granted CSIRO's motions for summary judgment of validity and infringement and denied Buffalo's cross motions on November 13, 2006 (Docket No. 228). Although the issue of CSIRO's damages has not been determined, the parties asked the Court to rule on CSIRO's motion for permanent injunction. Accordingly, CSIRO's motion for permanent injunction is now before the Court.

## APPLICABLE LAW

■ When considering whether to award permanent injunctive relief to a prevailing plaintiff in a patent infringement dispute, courts should apply the traditional four-factor test used by courts of equity. *eBay, Inc. v. MercExchange, LLC,* —— U.S. ——, ——, 126 S.Ct. 1837, 1839, 164

L.Ed.2d 641 (2006). The prevailing plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* The Supreme Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

## ANALYSIS

*Irreparable Harm Suffered by CSIRO*

CSIRO argues its licensing and research and development programs will be irreparably harmed if a permanent injunction is not granted. CSIRO further argues if it cannot obtain injunctive relief against Buffalo, others will be encouraged to infringe the '069 patent and risk litigation rather than enter into a license agreement. CSIRO argues a patent holder who does not practice its invention may establish irreparable harm "by showing that an existing infringement precludes his ability to license his patent...." *See Roper Corp. v. Litton Sys., Inc.,* 757 F.2d 1266, 1273 (Fed. Cir.1985); *Amazon.com Inc. v. Barnesandnoble.com Inc.,* 73 F.Supp.2d 1228, 1246 (W.D.Wa.1999); *see also Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1456 (Fed.Cir.1985) ("in the absence of the injunction, other potential infringers will be encouraged to infringe"). CSIRO contends a significant factor for its inability to license the '069 patent arises from potential licensees refusing to take a license if their competitors do not also take a license. A licensee's own licensing payments would put itself at a competitive disadvantage against infringers who are willing to risk detection and enforcement. Once the litigation against Buffalo commenced, there was little chance any company would take a license until Buffalo's defenses had been shown to be without merit. CSIRO further contends there remains little chance that others will take a license after this Court's summary judgment ruling since Buffalo announced its plan to appeal this Court's ruling.

Buffalo argues that since CSIRO and Buffalo are not competitors Buffalo does not irreparably harm CSIRO by depriving it of any profits from the sale of products, nor does Buffalo irreparably harm CSIRO by depriving it of any market share or brand name recognition. Buffalo contends that since *eBay* district courts have typically granted injunctive relief in favor of competitors but denied injunctive relief to non-competing licensors. *See TiVo, Inc. v. EchoStar Commc'ns Corp.,* 446 F.Supp.2d 664, 669 (E.D.Tex.2006) (Folsom, J.) (highlighting the fact that "Defendants compete directly with Plaintiff ..." in granting the permanent injunction); *Paice LLC v. Toyota Motor Corp.,* No. 2:04–CV–211–DF, 2006 WL 2385139, *4 (E.D.Tex. Aug.16, 2006) (Folsom, J.) (noting that "because Plaintiff does not compete for market share ... concerns regarding loss of brand name recognition and market share similarly are not implicated"); *Visto Corp. v. Seven Networks, Inc.,* No. 2:03–CV–333–TJW, 2006 WL 3741891, *4 (E.D.Tex. Dec.19, 2006) (Ward, J.) (noting that "[the parties] are not direct competitors, and this fact weighs heavily in the court's analysis").

However, in *eBay* the Supreme Court warned against creating broad classifications:

[S]ome patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their work to market themselves. Such patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so.

126 S.Ct. at 1840. The majority opinion in *eBay* rejected the conclusion that "a 'plaintiff's willingness to license its patents' and 'its lack of commercial activity in practicing the patents' would be sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue." *Id.* (internal citations omitted).

CSIRO is a research institution and relies heavily on the ability to license its intellectual property to finance its research and development. The revenue from licensing its intellectual property is used to fund further research and development for frontier projects. Every year, CSIRO identifies the portfolio of research and development projects that it will fund, and CSIRO actively maintains a list of frontier project opportunities for investment when additional funding becomes available. When extra funding becomes available, existing frontier projects are expanded to create greater benefits. Frontier projects could be initiated or developed sooner with additional licensing revenue. CSIRO provided many examples in areas of important research and development activities where increased funding would permit its research and development work to be expanded and produce beneficial results earlier including addressing the increasing rate of obesity and the consequential increase of Type 2 diabetes, developing biomaterials that can be used to aid recovery from traumatic damage to the body, and examining the impact of climate change and mitigating its causes.

CSIRO has shown that its harm is not merely financial. While CSIRO does not compete with Buffalo for marketshare, CSIRO does compete internationally with other research groups—such as universities—for resources, ideas, and the best scientific minds to transform those ideas into realities. CSIRO's reputation is an important element in recruiting the top scientists in the world. Having its patents challenged via the courts not only impugns CSIRO's reputation as a leading scientific research entity but forces it to divert millions of dollars away from research and into litigation costs. Delays in funding result in lost research capabilities, lost opportunities to develop additional research capabilities, lost opportunities to accelerate existing projects or begin new projects. Once those opportunities have passed, they are often lost for good, as another entity takes advantage of the opportunity. Delays in research are likely to result in important knowledge not being developed at all or CSIRO being pushed out of valuable fields as other research groups achieve critical intellectual property positions. Thus, the harm of lost opportunities is irreparable. They cannot be regained with future money because the opportunity that was lost already belongs to someone else.

■ Buffalo argues this harm is a past harm, for which injunctive relief is inappropriate. Buffalo also argues that denying a permanent injunction and forcing CSIRO to take a license would give CSIRO the licensing revenue it desires. While this is certainly a harm by Buffalo that CSIRO suffered in the past, it is also harm by others CSIRO will suffer in the future, as discussed in the next section. Similarly, for the reasons discussed in the next section, forcing CSIRO to extend a license to Buffalo will not cure this harm. The

irreparable harm factor favors a permanent injunction.

*Adequacy of Remedies Available at Law*

In addition to harming its research and development programs, CSIRO argues that if the Court does not enter a permanent injunction, the Court will force a compulsory license upon CSIRO. A compulsory license would not contain the negotiated business terms typically used by patent holders to control their inventions. CSIRO contends it has a right to control its licensing program and to choose to whom to license and on what terms. Further, the price of a compulsory license established through a trial on damages would be inadequate since CSIRO's past damages are limited compared to its ongoing damages.

Buffalo argues that a compulsory license would force Buffalo to pay CSIRO licensing royalties—the lack of which is CSIRO's alleged irreparable harm. Since CSIRO says its harm is in not having past royalty payments to fund its projects, Buffalo contends royalty payments today would be an entirely adequate remedy.

In *eBay,* the Supreme Court indicated that the right to exclude alone is not sufficient to support a finding of injunctive relief and that such relief " 'may' issue only 'in accordance with the principles of equity' " under § 283 of the patent act. *See eBay,* 126 S.Ct. at 1840. Accordingly, a violation of the right to exclude does not inevitably lead to the conclusion that a patent holder cannot be adequately compensated by remedies at law such as monetary damages without first applying the principles of equity.

The violation of a patent owner's right to exclude can present a situation where monetary damages cannot adequately compensate the patent holder for that injury. For example, when an infringer saturates the market for a patented invention with an infringing product or damages the patent holder's good will or brand name recognition by selling infringing products, that infringer violates the patent holder's exclusionary right in a manner that cannot be compensated through monetary damages. This is because it is impossible to determine the portions of the market the patent owner would have secured but for the infringer's actions or how much damage was done to the patent owner's brand recognition or good will due to the infringement. Although CSIRO has not suffered these particular types of harms, CSIRO's harm is no less important than other recognized forms of harm a competitor might suffer to its brand name or sales position in the market. Its reputation as a research institution has been impugned just as another company's brand recognition or good will may be damaged.

In his concurrence, Justice Kennedy instructed courts to be cognizant of the nature of the patent being enforced and the economic function of the patent holder when applying the equitable factors. *eBay,* 126 S.Ct. at 1842 (Kennedy, J., concurring) ("When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest."); *see also z4 Techs., Inc. v. Microsoft Corp.,* 434 F.Supp.2d 437, 440–41 (E.D.Tex.2006) (Davis, J.) (finding the infringing technology was "a small component of [Microsoft's] software" and the infringement did not hinder or exclude z4's sales or licensing of its product). The right to exclude becomes more urgent when the product is the invention.

This case is not the situation that concerned Justice Kennedy; Buffalo's infringing use of CSIRO's technology is not limited to a minor component of the technology. The '069 patent is the core technology embodied in the IEEE's 802.11a and 802.11g standards. Buffalo's products are designed to provide the wireless functionality of the IEEE's 802.11a and 802.11g standards. Since Buffalo's infringement relates to the essence of the technology and is not a "small component" of Buffalo's infringing products, monetary damages are less adequate in compensating CSIRO for Buffalo's future infringement.

A compulsory license will not adequately compensate CSIRO for Buffalo's continued intentional infringement. The royalty payment would be extrapolated from a determination of Buffalo's past sales, which may not adequately reflect the worth of the patent today to Buffalo. Further, such a royalty payment does not necessarily include other non-monetary license terms that are as important as monetary terms to a licensor such as CSIRO. Monetary damages are not adequate to compensate CSIRO for its damages, which are not merely financial.

*The Balance of Hardships*

If the Court does not issue the injunction, CSIRO will be forced to accept Buffalo as a compulsory licensee. The Court has already discussed how a compulsory license would harm CSIRO. Buffalo argues the issuance of an injunction will force Buffalo out of the WLAN business in the United States.

The hardship to Buffalo of permanently enjoining its infringing conduct is limited to the injury ordinarily expected when an injunction is imposed. Mere hardship incurred in the process of ceasing operations is not sufficient. *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). Buffalo's own damages expert claims "this product, to date, has not proven itself a commercial success in the United States for Buffalo." Plaintiff's Motion for Permanent Injunction Ritchey Decl. Exh. E at 11. Since wireless products make up only eleven percent of Buffalo Technology's business, Buffalo's hardship if it is precluded from making future wireless sales in the United States is far from catastrophic.[1] Further, no considerable hardship will be imposed on distributors and resellers by an injunction against Buffalo because those distributors and resellers may continue to sell non-infringing Buffalo products and other competing WLAN products.

The harm Buffalo faces by an injunction is purely monetary, whereas the harm CSIRO faces if no injunction issues has far reaching effects. CSIRO will not only be injured financially, but that financial injury will directly and negatively impact CSIRO's research and development efforts and its ability to bring new technologies into fruition. The balance of hardships favors CSIRO's motion for permanent injunction because the harm that continued infringement would likely cause CSIRO's

---

1. Buffalo does argue that enjoining Buffalo from its wireless sales in the Unites States will have a greater effect on its business than merely prohibiting eleven percent of its business because it has shelf-space agreements with distributors and distributors' may be less willing to carry other Buffalo products absent its wireless products. Buffalo does not elaborate on this concern. Given that Buffalo's wireless products make up only ten to fifteen percent of its U.S. business, it is difficult to believe that without such products distributors would be unwilling to sell other Buffalo products.

research and development projects outweighs the harm that an injunction would cause Buffalo in being excluded from competing in the WLAN market.

*The Public Interest*

CSIRO argues that the public has an interest in upholding patent rights and this is not one of the limited situations where an injunction would be contrary to the public's interest. Buffalo contends CSIRO has not shown how the public interest would not be served by the imposition of a compulsory license.

The public has an interest in a strong patent system. In general, public policy favors the enforcement of patent rights. *See Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed.Cir.2006); *PPG Indus., Inc. v. Guardian Indus., Corp.,* 75 F.3d 1558, 1567 (Fed.Cir.1996). The public maintains an interest in protecting the rights of patent holders as well as enforcing adequate remedies for patent infringement. Permanent injunctions serve that interest. In order to enforce a patentee's fundamental property right, courts have consistently allowed injunctive relief to patent owners whose patents have been infringed. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1246–47 (Fed.Cir.1989) ("Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property."); *In re Berwyn E. Etter,* 756 F.2d 852, 859 (Fed.Cir.1985) ("The essence of all property is the right to exclude and the patent property right is certainly not inconsequential.").

However, there are rare and limited circumstances in which an injunction would be contrary to a significant public interest such as health and safety concerns. *See, e.g., Hybritech, Inc. v. Abbott Lab.,* 4 U.S.P.Q.2d 1001, 1987 WL 123997 (C.D.Cal.1987) (public interest required

that injunction not stop supply of medical test kits that the patentee itself was not marketing), *aff'd,* 849 F.2d 1446 (Fed.Cir. 1988); *City of Milwaukee v. Activated Sludge,* 69 F.2d 577, 21 U.S.P.Q. 69 (7th Cir.1934) (injunction refused against city operation of sewage disposal plant because of public health danger); *see also z4,* 434 F.Supp.2d at 444 (finding the possible harm to the public slightly weighed against an injunction of Microsoft's products). No such interests are implicated here since Buffalo's WLAN products are not essential for the public health or public welfare. Buffalo has not shown how the public will be deprived of any benefit if Buffalo's products are enjoined. The public interest would not be disserved by a permanent injunction because WLAN products are obtainable from multiple sources other than Buffalo.

Research institutions, such as CSIRO, make substantial scientific advances. The work of research institutions is often at the forefront of scientific awareness. Although their work may not always have immediate applications, the work of research institutions has produced enormous benefits to society in the form of new products and processes. Because the work of research institutions such as CSIRO is often fundamental to scientific advancement, it merits strong patent protection. Furthermore, the public interest is advanced by encouraging investment by research organizations into future technologies and serves to promote the progress of science and the useful arts. Thus, the public interest factor favors CSIRO's motion for permanent injunction.

**CONCLUSION**

The balance of equities viewed through the facts of this case warrants injunctive relief. CSIRO has demonstrated it will suffer irreparable harm in the absence of a

permanent injunction, harm that cannot be remedied adequately through the recovery of monetary damages. The balance of the hardships weighs in favor of CSIRO. The public has an interest in maintaining a strong patent system, and the public would be harmed more by denying an injunction than granting one. Thus, the public interest weighs in favor of CSIRO. Accordingly, a permanent injunction should issue under the traditional four-factor test recited in *eBay*, and CSIRO's motion is **GRANTED.** Therefore, the Court does not reach whether the United States–Australia Free Trade Agreement Implementation Act requires an injunction.

The Court **ORDERS** the parties to meet and confer on the wording and practical implementation of the injunction and to submit a proposed permanent injunction to the Court within five days of this order.

So **ORDERED.**