Amy Totenberg, United States District Judge
In this patent infringement case, Plaintiff's Motion for Permanent Injunction [Doc. 643] is now before the Court.
I. Background
Plaintiff Canon, Inc. ("Canon") sued Defendants Color Imaging, Inc. ("Color Imaging") and its distributor, General Plastic Industrial Co., Ltd. ("GPI") for infringing three separate claims of Plaintiff's '012 patent. The three claims at issue describe certain technology involved with the connection *1344 of a toner cartridge inside of a Canon copier.
The case went to trial, and the jury issued a verdict in favor of Canon on June 19, 2017. The jury found that Defendants had infringed the three patent claims at issue, that their infringement was willful, that Defendants had not proven their affirmative defenses beyond a reasonable doubt, and that Plaintiff was entitled to $3,740,603 in damages for GPI's infringement and $730,380 for Color Imaging's infringement. (See Doc. 632.)
Plaintiff now moves for permanent injunctive relief.[1]
II. Discussion
Plaintiff moves for a permanent injunction "enjoining Defendants from infringing claims 24, 25, and 30 of the '012 patent, directly or indirectly, through the manufacture, use, offer for sale, or sale within the U.S., or importation into the U.S., of Type A and Type B toner bottles and any other product that is not more than colorably different from the Type A or Type B toner bottles." (Plaintiff's Motion for Permanent Injunction, Doc. 643-1 at 1.)
The Supreme Court sets forth the test for determining whether a plaintiff is entitled to a permanent injunction:
According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.
eBay Inc. v. MercExchange, L.L.C. , 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). A district court's decision whether to grant injunctive relief or not "rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id. at 394, 126 S.Ct. 1837.
A. Irreparable Injury
There is no presumption of irreparable injury following a finding of patent infringement. Robert Bosch LLC v. Pylon Mfg. Corp. , 659 F.3d 1142, 1149 (Fed. Cir. 2011). Rather, to satisfy the irreparable injury factor for permanent injunctive relief, the patent holder must establish the following two requirements: "1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." Apple Inc. v. Samsung Elecs. Co. , 695 F.3d 1370, 1374 (Fed. Cir. 2012). "Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." Douglas Dynamics, LLC v. Buyers Prod. Co. , 717 F.3d 1336, 1344 (Fed. Cir. 2013). Furthermore, "the causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition-e.g., 'sales [that] would be *1345 lost even if the offending feature were absent from the accused product.' " Apple Inc. v. Samsung Elecs. Co. , 735 F.3d 1352, 1361 (Fed. Cir. 2013) (quoting Apple Inc. v. Samsung Electronics Co. , 678 F.3d 1314 (Fed. Cir. 2012) ).
Plaintiff argues that it has and will continue to suffer irreparable injury if Defendants are not permanently enjoined from manufacturing, using, or selling in the United States, or importing into the United States, the infringing toner bottles (Type A and Type B toner bottles). In particular, Plaintiff contends that Defendants' infringement has caused it to lose market share, as Plaintiff and Defendants are "direct competitors" and "every sale made by Defendants is a sale Canon potentially would have made absent Defendants' infringement." (Doc. 643-1 at 17.) Plaintiff also contends that Defendants' infringement has caused it to suffer reputational harm. According to Plaintiff, a substantial percentage of customers will end up resenting Plaintiff for charging higher prices for toner bottles relative to Defendants. Plaintiff states that it has never licensed the '012 patent to another entity that sells toner bottles for Canon copiers, and without an injunction, Plaintiff would effectively be forced to do so.
Additionally, Plaintiff emphasizes that there is a "strong causal nexus" between Defendants' infringement and the harm suffered by Plaintiff. (Doc. 643-1 at 16.) Plaintiff describes the sealing member of '012 patented bottle as a key feature and a driver of consumer demand, as consumers would not purchase the infringing bottles unless they could be reliably inserted into Canon copiers with little or no mess.
In support of these assertions, Plaintiff largely relies on the trial testimony and declaration (attached to this motion)[2] of Mr. Fujino, a corporate representative of Canon. Plaintiff also cites to trial testimony of its expert, Mr. Tate; trial testimony of Mr. Hsu, a corporate representative of Defendant GPI; and the parties' stipulations before trial, among other things.
Defendants make a number of arguments as to why Plaintiff does not demonstrate irreparable injury, which the Court addresses in turn. For one, Defendants argue that they do not directly compete with Plaintiff for sales of the combined copier-plus-toner-bottle patented invention, and therefore they are not direct competitors. Defendants state that the true direct competitors of Plaintiff are companies that sell both toner bottles and copiers. As Defendants conclude, the relevant market is much narrower than Plaintiff characterizes it, and Plaintiff cannot explain "how any purported losses relate exclusively, if at all, to Defendants' sales."
*1346 (Doc. 657 at 5.) Defendants go on to argue that Plaintiff fails to present any evidence of what the relevant market is, Plaintiff's share of the relevant market, or what loss of Plaintiff's market share was caused by Defendants' sales of the infringing bottles as opposed to other potential causes. To underscore this argument, Defendants point to evidence of Plaintiff's toner bottle sales increasing from January 2010 through March 2014 whereas Defendants' infringing toner bottle sales decreased during this time period, indicating that Defendants actually lost market share.
Defendants do not cite to any authority for the first argument that they are not direct competitors with Plaintiff. Defendants simply cite to a number of cases issuing permanent injunctions where the infringer appears to have sold the entire patented invention. But Plaintiff rightly points to other cases issuing or affirming permanent injunctions under circumstances similar to this case-where the infringer sold only a component of the patented invention. See, e.g., Preemption Devices, Inc. v. Minn. Mining & Mfg. Co. , 803 F.2d 1170 (Fed. Cir. 1986) ; Eli Lilly & Co. v. Perrigo Co. , 202 F.Supp.3d 918, 1022-23, 1029 (S.D. Ind. 2016). This is the very sort of conduct that may constitute contributory infringement under 35 U.S.C. § 271 :
Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
35 U.S.C. § 271 (emphasis added). And under 35 U.S.C. § 283, a court may grant an injunction "to prevent the violation of any right secured by patent," including the right to protect against contributory infringement as well as direct infringement. 35 U.S.C. § 283 (emphasis added).
Moreover, Defendants already stipulated to the fact that their "Accused Toner Bottles compete with the Canon Toner Bottles directly in the market for toner bottles for Canon Copiers." (Doc. 592-1 at 15.) They further stipulated that "Defendants promote the following Accused Toner Bottles for use in the following Canon copiers in the United States, each of which is an electrophotographic imaging forming apparatus that includes an assembly having a hollow cylindrical driving member that has a slot formed therein, ... as required by the preamble of claim 24 of the '012 patent under the Court's construction." (Id. at 9.) These stipulations, along with evidence presented during trial, indicate that the relevant market is toner bottles sold for Set On III Canon copiers. (See, e.g. , Trial Transcript at 496-500 (Mr. Fujino's testimony describing sales of generic toner bottles as competing with sales of Canon's toner bottles for Canon Set On III copiers.)
In addition to evidence of the relevant market, Plaintiff presents evidence that Defendants' sales of the infringing toner bottles directly caused Plaintiff to lose sales of its own toner bottles. (See id. at 496-98, 702 (Mr. Tate, Plaintiff's expert, showing the infringing toner bottles priced lower than Canon's toner bottles and opining that the parties are "direct competitors such that "sales of accused toner products represent a potential lost opportunity for Canon to make a sale"); Doc. 367 at 18 (undisputed statement of material fact at summary judgment that "GPI's customers, such as Color Imaging, utilize the '012 patent to take toner sales away from Canon").)
*1347 Plaintiff also presents evidence that it lost customers to Defendants. At trial, Mr. Fujino testified that some of Plaintiff's customers chose to buy Defendants' lower-cost toner bottles. (Trial Transcript at 497.) And in his declaration attached to Plaintiff's motion for permanent injunction, Mr. Fujino states that, based on his knowledge and experience in the industry, "once customers purchase or use a generic replacement toner bottle for a given Canon copy machine, such as one of Defendants' Accused Toner Bottles, they are likely to continue to purchase or use generic toner bottles due to their price advantage." (Doc. 643-2 ¶ 19.)
It is simply untrue that Plaintiff presented no evidence of the relevant market or the link between Defendants' infringement and Plaintiff's loss of market share.[3] While Plaintiff's evidence on lost market share is more general in nature, as opposed to listing specific customers lost or calculating the specific percentage of market share lost, the law does not necessarily require such specificity. See, e.g., +i Ltd. P'ship v. Microsoft Corp. , 598 F.3d 831, 862 (Fed. Cir. 2010), aff'd, 564 U.S. 91, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011) ("[Plaintiff] was not required to prove that its specific customers stopped using [its] products" for the district court to find that the plaintiff suffered irreparable harm). Plaintiff's evidence still demonstrates that Plaintiff and Defendants were direct competitors and that Defendants took some sales away from Plaintiff by selling the infringing bottles.
The fact that Plaintiff's toner bottle sales increased and Defendants' toner bottle sales decreased from 2010 to 2014 does not defeat Plaintiff's showing of irreparable harm. For one, it could still be true that Defendants took market share away from Plaintiff during this time despite the parties' inverse sales trends. Mr. Fujino states in his declaration that "[e]very sale made by Defendants is a sale that Canon potentially would have made absent Defendants' infringement." In theory, this principle would remain true even if Defendants' sales were declining while Plaintiff's *1348 were increasing. The law does not require Plaintiff to show such a loss in market share that it is no longer a leader in the market or is struggling to stay afloat. Douglas Dynamics, LLC v. Buyers Prod. Co. , 717 F.3d 1336, 1344 (Fed. Cir. 2013) ("Simply because a patentee manages to maintain a profit in the face of infringing competition does not automatically rebut a case for irreparable injury. Irreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction."). Additionally, Plaintiff rightly points to trial testimony of Mr. Hsu, a corporate representative of Defendant GPI, where he states that GPI's customers were scared to buy its infringing toner bottles after Canon sued another allegedly infringing company in 2010 and then sued GPI and Color Imaging in 2011 and 2012. (Trial Transcript at 606.) This testimony suggests that some customers may start buying toner bottles from Defendants again if there was no permanent injunction, thus supporting Plaintiff's claim of irreparable harm in the absence of an injunction.
Another argument Defendants raise is that they have already been enjoined from selling the infringing toner bottles since 2015, so there is no threat of irreparable harm to Plaintiff. Defendants entered into a consent order with Plaintiff before the United States International Trade Commission ("ITC") on September 2, 2015, whereby Defendants claim that they "agreed to stop selling the Accused Products in this case." (Doc. 657 at 9.) Accordingly, Defendants argue that there has been no alleged infringement since the entry of the consent order. Defendants describe Plaintiff as having at least two years of controlling the relevant market and regaining any alleged loss of reputation or goodwill, and therefore Plaintiff's claims of irreparable harm are unfounded.
But as Plaintiff points out, the consent order does not state that Defendants shall "stop selling the Accused Products in this case." Rather, it states that Defendants shall not import infringing toner bottles or sell them for importation.[4] The scope of the consent order is narrower than the injunctive relief Plaintiff seeks here. For instance, Plaintiff emphasizes that the consent order does not stop GPI from setting up a manufacturing facility in the United States, nor does it stop Color Imaging from buying infringing bottles from another U.S. source and filling them with toner.
It is unclear from the record how likely it is that either of these events will take place. However, it is proper for this Court to consider past harms to Plaintiff, in part, when determining whether Plaintiff is entitled to a permanent injunction. i4i Ltd. P'ship v. Microsoft Corp. , 598 F.3d 831, 861 (Fed. Cir. 2010), aff'd , 564 U.S. 91, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011) ("Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.' ") (citing eBay , 547 U.S. at 391, 126 S.Ct. 1837 ). As discussed above, Plaintiff has shown evidence of past harms from Defendants' infringement. Furthermore, while it is also proper to consider whether there will be future harm from infringement, see *1349 Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd. , 518 F.Supp.2d 1197, 1214 (C.D. Cal. 2007), "[t]he fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further infringement will not take place." W.L. Gore & Assocs., Inc. v. Garlock, Inc. , 842 F.2d 1275, 1281-82 (Fed. Cir. 1988) (abrogated on other grounds). There is no evidence that Defendants in this case have stopped manufacturing the infringing bottles, that they lack the capacity to do so, or that they no longer have potential customers in the United States. Compare with Nichia Corp. v. Seoul Semiconductor, Ltd. , No. 06-0162 MMC, 2008 WL 346416, at *2 (N.D. Cal. Feb. 7, 2008) (denying permanent injunction where "it is undisputed that defendants no longer manufacture the accused product, that defendants currently have no potential customers for such product in the United States, and that, with the exception of one sale initiated by plaintiff almost three years ago and one extremely small additional sale that same month, defendants have never sold the accused product to a customer in the United States."). Thus, without an injunction, there is nothing stopping GPI from setting up a facility in the United States that manufactures infringing bottles, and likewise, there is nothing stopping Color Imaging from obtaining infringing bottles from another source in the United States. In circumstances such as these, the Court has the power "to prevent the violation of any rights secured by patent." 35 U.S.C. § 283.
Upon review of Defendants' other arguments, the Court finds them unpersuasive in undercutting Plaintiff's showing of irreparable harm. For example, Defendants argue that Plaintiff has harmed its own reputation as an innovator by continuing to allow Katun, another company that makes toner bottles for Set On III Canon copiers, to infringe the '012 patent. Plaintiff presented some evidence before and during trial, however, where Plaintiff explicitly stated it considered Katun's toner bottles to be "non-infringing alternatives" to Canon's toner bottles. (See, e.g. , Doc. 633-17 at 32 (emphasis added).)[5] With respect to Defendants' argument *1350 that Plaintiff licensed the '012 patent to Xerox and IBM, thus demonstrating Plaintiff's "willingness to forego injunctive relief for monetary compensation" (Doc. 657 at 19), the evidence is not so clear-cut. Plaintiff licensed the patent to Xerox, a competitor in the relevant market, yet the license expressly prohibited Xerox from selling toner bottles for Canon copiers. (Defendants' Exhibit 66, Doc. 633-34; Trial Transcript at 780-81.) Plaintiff also licensed the patent to IBM, but IBM was not a competitor in the relevant market at the time. IBM did not sell toner cartridges for use in Set On III copiers. (Trial Transcript at 780-82.) See, e.g. , Acumed LLC v. Stryker Corp. , 551 F.3d 1323, 1328-29 (Fed. Cir. 2008) (affirming lower court's finding of irreparable harm despite the plaintiff having licensed the patent before, particularly where "the court considered the previous licenses and distinguished them, albeit briefly, from the circumstances of this case," given that one previous license was part of a settlement agreement and the other previous license was to an entity that was not a direct competitor). The Supreme Court has made clear that there is no categorical rule that a plaintiff's willingness to license its patent precludes it from obtaining injunctive relief. eBay , 547 U.S. at 391, 126 S.Ct. 1837. Moreover, the Court finds that Plaintiff granted licenses to Xerox and IBM under circumstances that are distinguishable from this case in important ways, and therefore Defendants' argument on this point is unpersuasive.
Defendants make another related argument attacking the "causal nexus" element of irreparable harm-i.e., the causal link between Defendants' infringement and Plaintiff's harm. Defendants contend that Plaintiff's characterization of the sealing member of the toner bottle as a "key feature" of the invention is incorrect and that Plaintiff offers no evidence showing this feature influenced demand for Defendants' products. Additionally, according to Defendants, Plaintiff is essentially claiming that toner bottle compatibility with Canon copiers-more generally-is a key feature influencing customer demand, and this is too generalized a feature to establish causal nexus.
Contrary to Defendants' argument, Plaintiff has presented evidence of both (1) the sealing member (otherwise referred to as the cap) being a key or essential feature of the patented invention and (2) the sealing member making Defendants' product more desirable to consumers. For example, Plaintiff's damages expert, Mr. Tate, testified that "[a] key feature of [the] '012 patent is the multifunctional sealing member," which is "designed to deliver toner to copy machines in a reliable and efficient manner." (Trial Transcript at 707.) Defendants' expert, Dr. Sturges, also testified that the sealing member was an "essential feature" of claim 24 of the patent. (Trial Transcript at 1418.)
As for this feature's desirability among consumers, Yukata Ban, the inventor of the '012 patent, testified that "with regard to the cap portion, we came up with an entirely new type of snap fit coupling" and ultimately produced a "superior toner bottle" with "[g]reat usability, [that was] inexpensive to manufacture, and [with] almost no mess." (Trial Transcript at 270-71.) Mr. Fujino further states in his affidavit that "Defendants' customers would not buy the Accused Toner Bottles unless they could be inserted into a copy machine, unsealed and rotated inside the copy machine to discharge toner, re-sealed inside the copy machine, and safely removed from the copy machine." (Doc. 643-2 ¶ 18.) Dr. Sturges provided similar testimony, when he stated that the following description in the '012 patent was "equally applicable" to Defendants' toner bottles:
*1351 Accordingly, it is a principal object of the present invention to provide a sealing member in which a sealing member is locked with an image forming apparatus in order to open or unseal a toner discharge opening of a toner accommodating container, and yet the sealing member can be released from the image forming apparatus with a simple structure.
(Trial Transcript at 1421.)
Consistent with the Federal Circuit's decision in Apple Inc. v. Samsung Elecs. Co. , 735 F.3d 1352 (Fed. Cir. 2013), Plaintiff need not show that the sealing member is the exclusive reason for consumer demand, but may use a variety of ways to "show some connection between the patented feature and demand for [the infringing] product," such as "evidence that the inclusion of a patented feature makes a product significantly more desirable." Id. at 1364. Here, Plaintiff has produced evidence that sufficiently demonstrates this causal connection between the sealing member feature and consumer demand for Defendants' toner bottles.
Moreover, the evidence does not show that Plaintiff merely relies on "generalized features" of Defendants' toner bottles (i.e., toner bottle compatibility with Canon copiers) to demonstrate causation. The evidence specifically refers to the "sealing member" element of claim 24. This case is distinguishable from the Apple case, where the plaintiff broadly asserted that the iPhone's "design" was a key feature-which included "a whole host of unprotectable, unpatented features" and did not prove that "any more specific element of the iPhone's design, let alone one covered by one of Apple's design patent patents, actually drives consumer demand." Apple , 735 F.3d at 1365 (finding the plaintiff's evidence "too general" to establish a causal nexus) (internal quotations omitted).
In sum, upon considering all of the evidence and the factors and arguments discussed above, the Court finds that Plaintiff has demonstrated irreparable harm from Defendants' infringement of the '012 patent. There is sufficient evidence that Plaintiff competed with Defendants for customers in the relevant market and that Plaintiff lost goodwill and market share to Defendants because of their infringement. These are the very types of harms that are difficult to quantify and that are difficult for Plaintiff to avoid absent an injunction. See, e.g., Robert Bosch , 659 F.3d at 1154-55 ; Metso Minerals , 788 F.Supp.2d at 74. And although Plaintiff has licensed the patent to some entities, such as Xerox and IBM, the circumstances of these licenses are distinguishable from this case, where Defendants are directly competing with Plaintiff for Canon-copier toner bottle sales. Thus, this first factor weighs in favor of Plaintiff.
B. Inadequacy of Monetary Remedies
"In the patent context, the second prong of the permanent injunction test is generally treated in tandem with the first prong." Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd. , 788 F.Supp.2d 71, 76 (E.D.N.Y. 2011). For this second prong, the inquiry is whether "monetary damages cannot adequately compensate the patent holder for that [infringement] injury." Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. Inc. , 492 F.Supp.2d 600, 605 (E.D. Tex. 2007). More specifically:
[W]hen an infringer saturates the market for a patented invention with an infringing product or damages the patent holder's good will or brand name recognition by selling infringing products, that infringer violates the patent holder's exclusionary right in a manner that cannot be compensated through monetary damages. This is because it is *1352 impossible to determine the portions of the market the patent owner would have secured but for the infringer's actions or how much damage was done to the patent owner's brand recognition or good will due to the infringement.
Id.
The Court has already laid out in detail why it is satisfied that the evidence demonstrates Plaintiff's loss of market share and a loss of goodwill among customers due to Defendants' infringement of the '012 patent. Much of the same evidence supports the finding that Plaintiff would continue to suffer these harms-which are not readily compensable by monetary damages-without a permanent injunction.
Defendants argue that Plaintiff's licenses to Xerox and IBM "establish Canon's willingness to surrender future exclusionary rights in its Set-On III technologies" and undermine Plaintiff's argument that monetary damages are inadequate. (Doc. 657 at 23.) However, as discussed above, Plaintiff granted these licenses under circumstances distinguishable from this case: (1) Xerox's license explicitly prohibited it from competing with Plaintiff in the relevant market (i.e., selling toner bottles for Canon Set On III copiers), and (2) IBM was not a direct competitor with Plaintiff at the time IBM was granted a license. These sorts of factors are relevant in determining whether monetary damages would adequately compensate a plaintiff for a defendant's infringement and whether a plaintiff's past licensing activities are distinguishable from the present situation. Apple , 735 F.3d at 1370 (Fed. Cir. 2013). Based on the totality of the evidence before it, the Court finds that Plaintiff's damages are "not merely financial" and therefore monetary compensation would be inadequate. Buffalo Tech. , 492 F.Supp.2d at 606. This second factor also weighs in favor of Plaintiff.
C. Balance of Hardships
"The balance of hardships factor assesses the relative effect of granting or denying an injunction on the parties." Apple Inc. , 735 F.3d at 1371 (internal quotations omitted).
If the Court denied an injunction, Plaintiff argues it would suffer harm based on Defendants' continued sales of infringing toner bottles and based on other entities encouraged to enter the same market as a result of Defendants' unchecked infringement. Both of these infringing activities, Plaintiff asserts, would decrease demand for Plaintiff's toner bottles and would therefore hinder its ability to recoup its upfront research and development investment. Plaintiff further asserts that any harm to Defendants from such an injunction would be slight and "of their own making" as willful infringers. (Doc. 643-1 at 20.) Plaintiff points to evidence that, during the time when Defendant Color Imaging was selling the infringing toner bottles, these sales comprised just 2-6% of Color Imaging's total sales. Similarly, Plaintiff points to evidence that, around the same time, Defendant GPI's sales of infringing toner bottles comprised just 1.26% of GPI's total sales.[6]
In contrast, Defendants argue they would suffer relatively greater harm if the Court granted an injunction. Defendants contend that they "would be forced to explain to their customers why this Court entered a second injunction"-given that Defendants already consented to an injunction pursuant to the 2015 ITC consent *1353 order-and this would cause Defendants reputational damage. (Doc. 657 at 25.) Defendants also contend that Plaintiff fails to establish any hardship without an injunction because Defendants have already shown, through their previous arguments on factors one and two, that Plaintiff's claimed harms are "unsubstantiated and contradicted by the record." (Id. at 24.) With respect to willfulness, Defendants argue that Plaintiff cannot rely on the jury's willfulness verdict to suggest hardship on its side, as willfulness provides for remedies at law and as an injunction is not meant to be punitive.
Having considered the evidence and arguments on both sides, the Court finds that, on balance, Plaintiff would suffer greater harm if the Court denied an injunction. Without an injunction, GPI would still be free to set up a manufacturing facility in the United States that makes infringing toner bottles, and Color Imaging would still be free to buy infringing toner bottles from another U.S. source. The ITC consent order does not bar Defendants from taking these actions, and as discussed above, these actions would continue to cause Plaintiff to lose market share and goodwill with its customers. See, e.g., Smith & Nephew, Inc. v. Arthrex, Inc. , No. CIVA207CV335TJWCE, 2010 WL 2522428, at *3 (E.D. Tex. June 18, 2010) ; Metso Minerals , 788 F.Supp.2d at 76. In contrast, Defendants cite one hardship from an injunction: reputational harm from having to explain a "second" injunction to their customers. The Court acknowledges that Defendants may have to explain to some customers why an injunction was entered in this case, but any resulting reputational harm seems a marginal increase beyond the reputational harm they have already suffered as a result of the jury's willfulness verdict. This claim of hardship does not tip the third factor in Defendants' favor, especially in light of other cases where courts have balanced this factor against defendants that have claimed much greater hardship than here. See, e.g., Whirlpool Corp. v. Glob.Purification, LLC , No. 2:16-CV-463-JRG, 2017 WL 2099771, at *4 (E.D. Tex. May 15, 2017) (granting a permanent injunction, and with respect to the third factor, stating that "[a]lthough such an injunction could significantly impair and possibly destroy Defendant's business, that alone cannot justify denial of an injunction"); Bosch , 659 F.3d at 1156 (on the third factor, stating that "[a] party cannot escape an injunction simply because ... its primary product is an infringing one"). Rather, the likely continued harm to Plaintiff's market share and goodwill with customers favors issuance of a permanent injunction.
D. Public Interest
"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i Ltd. P'ship v. Microsoft Corp. , 598 F.3d 831, 863 (Fed. Cir. 2010), aff'd , 564 U.S. 91, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011). This factor often favors injunctive relief when the patentee practices the patented invention, as "the public generally does not benefit when [ ] competition comes at the expense of a patentee's investment-backed property right." Apple Inc. v. Samsung Elecs. Co. , 809 F.3d 633, 647 (Fed. Cir. 2015). Yet this factor "may favor an infringer when injunctive relief will result in a socially valuable technology becoming unavailable or substantially more expensive." Metso Minerals , 788 F.Supp.2d at 76.
Plaintiff argues this factor weighs in its favor because of the strong public interest in protecting patent rights, especially where the patent holder is a practicing *1354 entity that makes and sells its patented products in the marketplace. This sort of protection, Plaintiff asserts, encourages innovators to invest in upfront research and development, whereas the lack of an injunction disincentivizes innovation. Additionally, Plaintiff argues that an injunction against Defendants would not harm the public. There would be no shortage of toner bottles, as Plaintiff is ready to meet the demand and as the evidence at trial shows that Katun also makes competing, non-infringing toner bottles.
In response, Defendants raise two main arguments that there are strong public policy interests against granting an injunction here. First, Defendants assert that an injunction would be anti-competitive. It would eliminate the only real competition Plaintiff has for its Set On III toner bottles. In particular, Defendants challenge Plaintiff's assertion that Katun toner bottles are acceptable alternatives that compete with Plaintiff's toner bottles. Defendants cite to an admission and interrogatory response by Plaintiff, where Plaintiff stated that it "denies [Katun] toner bottles products are 'competitive' with, or acceptable alternatives to, any Canon Toner Bottle Product or any Accused Toner Bottle product" and that it "is not aware of any acceptable, non-infringing substitutes" for the patented product. (Doc. 633-33 at 13, 49.) Defendants further assert that Plaintiff's argument about the sealing member-that it drives demand for Set On III toner bottles-means consumers would be induced to buy Canon's Set On III copiers along with the toner bottles, "thereby allowing Canon to dominate both toner bottle and copier sales via a de facto tying arrangement." (Doc. 657 at 27.)
Defendants' second argument on the public interest factor is that Plaintiff has unclean hands and therefore cannot seek an equitable remedy. Defendants claim that Plaintiff previously pursued a European patent for the same invention, and in doing so, Plaintiff made statements about the "engaging portion" of claim 24 that contradict Plaintiff's statements about the same language at issue in the '012 patent here. On one hand, Defendants point out that Plaintiff represented to the Court during claim construction in this case that "engaging portion" in claim 24 meant any projection, including the inward projection illustrated in Figures 26, 28, and 29 of the '012 patent. On the other hand, Defendants point out that Plaintiff represented to European Patent Office that the "engaging portion" was more narrowly construed-as being limited to the tooth or radially outward projection in Figures 23, 24, 25 and 32 of the European patent, and that all other figures were not covered by the patented invention. Defendants also point to testimony by Mr. Ban and Dr. Sturges that claim 24 does not cover Figures 26, 28, and 29. Defendants argue that Plaintiff has taken "directly contradictory positions" in representing what claim 24 means, and therefore Plaintiff has unclean hands. (Doc. 657 at 30.)
When discussing the effect of an injunction on the Set On III toner bottle market, both sides largely rely on evidence about Katun toner bottles to make their points. The evidence is somewhat mixed regarding Katun bottles and whether they are reasonable alternatives-and thus act as competitors-to Canon toner bottles.[7]
*1355 Both sides have made seemingly contradictory statements and arguments on this very issue, and the Court has acknowledged this inherent tension in the case before. (See Doc. 534.) Specifically, Plaintiff stated in response to Defendants' request for admissions that "Canon denies that [Katun] toner bottles are 'competitive' with, or acceptable alternatives to, any Canon Toner Bottle Product or any Accused Toner Bottle Product." (Doc. 633-33 at 13.) In response to an interrogatory request, Plaintiff also stated that "Canon is not aware of any acceptable, non-infringing substitutes, nor have Defendants identified any." (Id. at 49.) In contrast, Defendants stated that "GPI believes that the following products sold in the United States by Katun Corporation compete with GPI's Accused Toner Bottle Products and are non-infringing alternatives to the Canon Toner Bottle Products." (Doc. 354-6 at 20.) Now, with respect to the public interest factor, both sides want to argue the opposite of their prior statements.
The Court has considered the parties' pre-trial statements regarding Katun's competitiveness with Canon's toner bottles, as well as the evidence presented at trial on this issue. The Court is persuaded that the overall evidence suggests, though not overwhelmingly so, that Katun toner bottles compete with Canon toner bottles-to the extent that Canon would not have a total monopoly if an injunction were granted against Defendants' toner bottles. Mr. Fujino testified that Katun sells generic toner bottles for Set On III copiers, and he identified several specific Katun bottles that are compatible with Set On III copiers. (Trial Transcript at 500, 504-06.) Mr. Hsu also testified that Katun sells their own design of toner bottles for Set On III copiers. (Id. at 1014-15.) While Mr. Hsu noted that these Katun bottles have certain functionality issues, where certain models do not engage well with the Canon copiers, this evidence does not negate the fact that Katun competes with Canon in some way. It simply suggests that Katun's products may not be as attractive to some customers as Canon's products. Moreover, the record does not show that Katun is a small player, incapable of meeting customer demand for Set On III-compatible toner bottles. Rather, witnesses for both sides testified that Katun is the largest supplier of generic toner bottles, with Mr. Hsu describing Katun as "Number 1 in our industry." (Trial Transcript at 504, 1006.)
Based on this record,[8] the Court is not convinced that an injunction against Defendants would result in Canon holding a monopoly over the relevant market or make "a socially valuable technology [ ] substantially more expensive." Metso Minerals , 788 F.Supp.2d at 76. While Katun bottles may not be the ideal alternative to Canon bottles, they appear to be alternatives nonetheless. This evidence moves the public interest factor slightly in favor of enhancement.
Turning to Defendants' argument about Plaintiff's unclean hands, the Court does not find this argument to be persuasive. For one, Plaintiff is correct that Defendants provide no support for their assertion that Plaintiff described "engaging portion" in the European patent as being "limited to the tooth or radially outward projection in Figures 23-25 and 32." (See Doc. 657 at 30.) Defendants merely cite to *1356 Plaintiff's statement to the European Patent Office that "the engaging portion has to be in form of a projection"-not that it extends in a certain direction, such as extending radially outward. (Id. at 29.) Moreover, Defendants appear to take Plaintiff's statements during claim construction in this case out of context. Plaintiff did not argue during claim construction-contrary to Mr. Ban's and Dr. Sturges's testimony-that claim 24 covers Figures 26, 28, and 29 (which each include an inwardly-extending projection). Rather, Plaintiff argued that there is nothing to indicate that the phrase "an engaging portion provided at a free end of said supporting portion" in claim 24, on its own, means that the engaging portion must extend radially outwardly. And Plaintiff pointed to Figures 26, 28, and 29 as support for this argument since these embodiments have inwardly-extending engaging portions. This is not the same as admitting that claim 24 as a whole covers Figures 26, 28, and 29. Thus, Plaintiff's positions are not technically contradictory, though the Court recognizes that Plaintiff walks a thin line in distinguishing its positions. Simply put, this evidence does not sufficiently demonstrate that Plaintiff has unclean hands so as to bar equitable relief.
The Court is left with Plaintiff's argument that the public has a strong interest in protecting patent rights and incentivizing innovation, especially for practicing patent holders. This is a well-established principle in patent case law. See, e.g., Apple Inc. , 809 F.3d at 647 ("[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."). This principle, together with the evidence regarding Katun as an existing competitor (albeit an imperfect one) to Canon, causes the public interest factor to weigh slightly in favor of Plaintiff.[9]
III. Conclusion
Overall, when weighing the four eBay factors together, the Court finds in its equitable discretion that Plaintiff is entitled to a permanent injunction. The Court hereby GRANTS Plaintiff's Motion for Permanent Injunction [Doc. 643]. The Court enjoins Defendants from infringing claims 24, 25, and 30 of the '012 patent, directly or indirectly, through the manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of Type A and Type B toner bottles and any other product that is not more than colorably different from the Type A or Type B toner bottles.[10]
IT IS SO ORDERED this 22nd day of February, 2018.

In connection with Plaintiff's Motion for Permanent Injunction, Defendants filed a motion to seal its Response [Doc. 658] so that certain portions are redacted, and Plaintiff filed a motion to seal its Reply [Doc. 663] so that similar portions are also redacted. Upon review, the Court finds good cause for sealing both documents as requested and hereby GRANTS the two motions [Docs. 658, 663].

Defendants argue that the Court should not consider Mr. Fujino's post-trial affidavit attached to Plaintiff's Motion, or his trial testimony, regarding potential or existing customers' assumptions or preferences. (Doc. 657 at 10-11.) Defendants contend that Mr. Fujino's affidavit and testimony are lacking proper foundation and are improper expert opinions. However, Defendants did not object to Mr. Fujino's testimony on these points during trial and therefore Defendants waived these objections. The Court also does not consider the admission of Mr. Fujino's testimony to be erroneous based on his personal experience and knowledge in his position at Canon. See Robert Bosch LLC v. Pylon Mfg. Corp. , 659 F.3d 1142, 1154 n.5 (Fed. Cir. 2011). As for Mr. Fujino's affidavit, the Court may also consider such post-trial affidavits in determining whether to grant a permanent injunction. See Smith & Nephew, Inc. v. Arthrex, Inc. , No. CIVA207CV335TJWCE, 2010 WL 2522428, at *3 (E.D. Tex. June 18, 2010). However, the Court gives limited as opposed to full credit to Mr. Fujino's statements regarding market share and customers' preferences, as he provided no data to support these statements.

Defendants cite to two District of Delaware cases where, in each case, the court found that the plaintiff's evidence regarding lost market share was insufficient to demonstrate irreparable harm. See Praxair, Inc. v. ATMI, Inc. , 479 F.Supp.2d 440 (D. Del. 2007) ("Praxair generally argues that VAC®'s presence in the market will cause Praxair to 'likely lose additional market share, profits, and goodwill,' without further detail. Praxair has not provided or described any specific sales or market data to assist the court, nor has it identified precisely what market share, revenues, and customers Praxair has lost to ATMI."); Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc. , 579 F.Supp.2d 554 (D. Del. 2008) ("ACS has not addressed the fact that BSC holds a larger market share than Medtronic. Moreover, ACS has not identified any specific customers it has lost, or stands to lose, directly as a result of Medtronic's continued sales of infringing stents.").
These cases are distinguishable, as neither indicates that the defendant stipulated or conceded that it directly competed with the plaintiff and took sales away from the plaintiff-as Defendants did in the present case. But even so, to the extent these two cases can be read as requiring a plaintiff to show evidence of actual lost market share or specific lost customers, this is not the law under the Supreme Court's decision in eBay, 547 U.S. at 393, 126 S.Ct. 1837 (rejecting a "categorical" grant or denial of injunctive relief, and instead reinforcing that a district court's discretion to grant or deny such relief "must be exercised consistent with the traditional principles of equity"); see also e2Interactive, Inc. v. Blackhawk Network, Inc. , No. 09-CV-629-SLC, 2012 WL 13000524, at *3 (W.D. Wis. Dec. 6, 2012) ("The Supreme Court made clear in eBay that there are no categorical rules or presumptions at a court's disposal when deciding whether to enter a permanent injunction.... Although evidence of past harm to a patentee's market share, revenues and brand recognition is relevant for determining irreparable injury, it does not establish a general rule.").

"Respondents shall not sell for importation, import into the United States, or sell or offer for sale in the United States after importation of the Subject Articles [i.e., infringing toner bottles], directly or indirectly, and will not aid, abet, encourage, participate in, or induce importation into the United States, the sale for importation into the United States, or use in the United States after importation of the Subject Articles, except under consent or license from Canon." (Doc. 644-5 at 3.)

Defendants argue that Plaintiff's response to an interrogatory shows that Plaintiff considers Katun bottles to infringe claim 24. Defendants' interrogatory and Plaintiff's response are as follows:
Interrogatory No. 21
For each Competitive Toner Bottle Product identified in response to Interrogatory No. 20 that includes neither a part shown in Appendix A, nor a part as shown in Appendix B, describe the "sealing member" included as part of the "toner supply container" used to "mount[ ]" the Competitive Toner Bottle Product "to an assembly of an electrophotographic imaging forming apparatus having a hollow cylindrical driving member that has a slot formed therein, which slot extends in a circumferential direction and defines a plurality of interior surfaces of the hollow cylindrical driving member, and a hollow cylinder that is substantially concentric with the hollow cylindrical driving member," within the meaning of claim 24 of the '012 Patent.
Response to Interrogatory No. 21
Subject to and without waiver of the foregoing general objections, Canon responds as follows: The Katun 34148, 36987, 37300, 37445, 37648, 39181, and 39709 products and their sealing members are shown in the photographs below. Except for the 34148 product (which could not be located), these products are available for inspection at the Washington, DC office of Fitzpatrick, Cella, Harper & Scinto through April 30, 2014, after which they will be returned to Canon in Japan.
(Doc. 345-8 at 17.) Plaintiff argues that it is unclear from Defendants' interrogatory what exactly the phrase "within the meaning of claim 24" is modifying, and therefore Defendant cannot use this as evidence that Canon admits Katun bottles infringe claim 24. The language of Defendants' interrogatory is indeed complex and subject to differing interpretations, as is Plaintiff's response.

While Defendants presented evidence that their Type A and Type B toner bottle sales substantially declined during the relevant time period, there is no evidence indicating that Type A and Type B toner bottle sales otherwise made up a large percentage of Defendants' overall sales during different times.

While recognizing the mixed evidence regarding Katun toner bottles, the Court maintains that the jury had sufficient evidence to find that there are reasonable, non-infringing uses for Set On III copiers, such as Katun toner bottles, and therefore to find that Defendants had not proven their affirmative defenses of exhaustion, implied license, or permissible repair.

Plaintiff also cites to a magazine article, published after trial, in which Defendant GPI recently stated that the company had made "a new revision design for the products in this area to meet market demand." (Doc. 643-5.) If true, this could potentially undermine Defendants' argument that Plaintiff would have no real competition after an injunction. But there is no evidence showing that this statement is indeed true or that Defendants' new design is ready for sale, so the Court affords this article little to no weight.

The Court does not assign any weight to Plaintiff's separate argument regarding other infringers of Plaintiff's toner bottles and their willingness to agree to permanent injunctions. Other companies' decisions to enter into permanent injunctions does not affect the Court's decision about whether to grant one here, and Plaintiff cites no authority for considering this sort of evidence on a motion for permanent injunction.

The Court does not reach the issue of whether Defendants' new design-around toner bottle product, referenced in the article attached to Plaintiff's Motion, falls within this permanent injunction Order. There is no evidence on this new product before the Court, and therefore it is possible that the new product may fall outside the bounds of this Order.